IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

BARBARA  MOHON,

     Plaintiff,

v.                               case no.  1:22-cv-00108-GBW-LF

JOHN CALDWELL SPILLER II,
JAKOB ALEXANDER MEARS,
MICHAEL THERON SMITH JR.  and
SCOTT  PERRY  SHAPIRO,

          Defendants.

## MOTION  FOR  DEFAULT  JUDGMENT

TO THE HONORABLE COURT:

     Plaintiff has not sought concurrence of Defendants[1] for the relief sought by this motion because they have not answered or responded to the Summons or Complaints in this case, and the Clerk of Court has entered their defaults.   Doc. 12 filed on 3/30/22 and Doc. 20 filed on 07/12/22. Declarations of Non-Military Service were filed as Doc. 11 on 3/30/22 and Doc. 18 on 07/11/22.

     Because Defendants have defaulted, the facts stated in Doc. 5 filed on 2/20/22 (Plaintiff's Amended Complaint - hereinafter "**Doc. 5**") should be accepted as true by the Court and deemed admitted by Defendants.  Fed.R.Civ.Pro 55.  Default judgment is available when the process has been halted because of an essentially unresponsive party in which instance the diligent party must be protected lest he be faced with interminable delay and continued uncertainty as to his rights.

---

[1]     Jakob Alexander Mears  ("Mears"), John Caldwell Spiller II ("Spiller"), Michael Theron Smith Jr. ("Smith") and Scott Perry Shapiro ("Shapiro")   (collectively "Defendants")

*Gallegos v. Franklin*, 1976-NMCA-019. The possibility of default must be a deterrent to those who choose delay as their litigation strategy. *Id*. When considering a motion for default judgment the Court must decide whether the facts create a legitimate basis for entry of a judgment.

Plaintiff requests Default Judgment against Defendants on her claims for statutory damages pursuant to the federal Telephone Consumer Protection Act (47 U.S.C. § 227 - "the TCPA") and the New Mexico Unfair Practices Act (Chapter 57 Article 12 of New Mexico state statutes - "the UPA"). As additional support for this motion, the facts set forth in Doc. 5, and to give the Court an adequate basis to calculate statutory damages (based on the number of Defendants' unlawful telephone solicitations to Plaintiff the subject of this case), **Plaintiff's Declaration is Exhibit 1** to this motion. Plaintiff's Declaration establishes that she was harassed by "over" one-hundred (100) of the robocalls described in Doc. 5, each in excess of 15 seconds long.[2]

As set forth in more detail below, the evidence supports judgment against Defendants jointly and severally for **400** violations of the TCPA and **400** violations of the UPA. Default judgment should be entered for up to $1500 for each of 400 TCPA violations plus $300 more for each of the 400 UPA violations totaling no more than **$570,000.00**.

Only two (2) allegations are necessary to state Plaintiff's **Subsection B** TCPA claim: telemarketer called her cell-phone, and telemarketer did so using a pre-recorded message **or** an automatic telephone dialing system. *Hossfeld v. GEICO*, 88 F.Supp. 3d 504 (D.Md. 2015); *Mestas v. CHW Group Inc. et al*, 508 F.Supp.3d 1011, 1022 (D.NM 2020).

Plaintiff's Complaint also gives notice of multiple "do not call" or **Subsection C** TCPA violations because paragraph 45 of Doc. 5 states Plaintiff's cell-phone number is listed on the

---

[2]    See paragraph 31 of Doc. 5 filed on 2/20/22 regarding the length of the calls.

National Do Not Call Registry (see citations at paragraphs 4 and 5 of Doc. 5),[3] paragraph 24 of Doc. 5 states Defendants' calls occurred "repeatedly" starting in June 2018, and paragraph 56 states the solicitations occurred "more than once within 12 months".   Plaintiff's Declaration at Exhibit 1 hereto and paragraph 56 of Doc. 5 establish that all the calls were made within a 12-month period.   See *Mestas*, supra, 508 F.Supp.3d 1011 at 1028-1029 describing the elements of the claims provided by Subsection C of the TCPA.[4]

In addition to the distinct claims provided for by 47 C.F.R. § 64.1200**(c)**,  Doc. 5 also gives notice of Plaintiff's additional Subsection C claims pursuant to 47 C.F.R. § 64.1200**(d)** because:

a)  paragraph 12 of Doc. 5 incorporates the facts stated in the FCC-Order;

b)  paragraph 22 of Doc. 5 states Defendants did not maintain internal do-not-call lists;

c)  paragraphs 28 and 30 describe Plaintiff's personal experiences with Defendants' calls;

d)  paragraphs 37 & 38 state violations of § 64.1200(d).   Defendants are in possession and controll of all the evidence and information that would either support or disprove the facts stated at paragraphs 37 & 38 of Doc. 5 but they have chosen to default rather than provide this evidence and information.

---

[3]     A listing on the Registry creates a presumption the phone number is to a residential subscriber. See the FCC's Order Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C. Rcd. 14014 at 14039 (also discussed in *Mestas*, supra, 508 F.Supp.3d 1011 at 1028).

[4]     *Mestas* discusses the statutory language used by Subsection C, which refers merely to a right of action for  "violation of the regulations".  *Mestas* discusses also the distinct regulations themselves which provide for separate causes of action.   In a nutshell and as set forth in more detail in *Mestas*, the "regulations" at 47 C.F.R. § 64.1200**(c)**  -   (a)  established the National Do Not Call Registry and   (b) require telemarketers to subscribe to and comply with the Registry.    Thus a private right of action exists pursuant to Subchapter C of the TCPA to remedy the making of telephone solicitations to a do-not-call registered phone number.  A separate violation of Subsection C is set forth at 47 C.F.R. § 64.1200**(d)** which requires certain reasonable business policies and practices from telemarketers including internal training (i.e. - supervision) and the maintenance of an internal do-not-call list.

Doc. 5 also states four (4) separate UPA violations within each call because the Complaint alleges  1)  calls that were not only automated but in addition used pre-recorded messages, thus violating NMSA §57-12-22(A);[5]  2)  violations of §57-12-22(B)(1) because the callers failed and refused to identify themselves or the sponsors of the calls, during the calls, as required by law;[6] 3)  violations of §57-12-22(C)(1) because Plaintiff's phone number has been registered on the National Do Not Call Registry at all relevant times;[7]  AND  4)  violations of §57-12-22(C)(2) because Defendants used Caller ID spoofing to intentionally circumvent Plaintiff's use of her Caller ID service.[8]

A plaintiff alleging a violation of the TCPA "need not allege any additional harm beyond the one Congress has identified." *Van Patten v. Vertical Fitness*, 847 F.3d 1037, 1043 (9th Cir. 2017) (and citing *Campbell-Ewald Co. v. Gomez*, 136 S.Ct. 663, 672, 193 L.Ed.2d 571 (2016)). See also for example the Article III analysis in *LaVigne v. First Cmty. Bancshares,* 215 F. Supp. 3d 1138, 1145 (D.NM 2016).    The same principles apply to standing for UPA claims.

Cell phones are "such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Riley v. California,*

---

[5]      See for example paragraphs 25-30 of Doc. 5 describing Defendants' calls

[6]      See paragraph 31 of Doc. 5

[7]      See paragraphs 4, 5 and 45 of Doc. 5.   Note a distinction between TCPA Subsection C claims and the UPA   -   to have a private right of action pursuant to 47 USC § 227(c)(5) the consumer must have received "more than one" telephone solicitation from the defendant within a 12-month period, whereas §22(B)(1) of the UPA provides a right of action for even just one single solicitation to a Do-Not-Call registered phone number.

[8]      See paragraphs 26 and 27 of Doc. 5.    Congress has defined the use of Caller-ID spoofing in telephone solicitations as a crime (i.e. - willful behavior), because a "sales lead" is "a thing of value".   47 USC § 227(e)1 and § 227(e)(5)(B).  See further discussion of the same throughout the FCC-Order filed as Doc. 1-1 in this case on 02/16/22.  Note in particular the FCC-Order's paragraph 19 with citations regarding the *mens rea*  involved.

4

573 U.S. 373, 385 (2014).  The constant proximity of cell phones means that unwanted calls interrupt every aspect of life.  Strong enforcement of the law is needed now more than ever.

Widespread adoption of cell phones has exacerbated the harmful effects of robocalls.  At the end of 2018,  57.1% of American households were wireless-only:  3.2% more than the previous year.[9]  Nearly all Americans (96%) own a cell phone, and those of 81% of Americans are smart-phones.[10]  As the Court noted in *Riley*, "it is the person who is not carrying a cell phone . . . who is the exception." 573 U.S. at 395.  Americans use their phones for many everyday tasks, which robocalls routinely interrupt.  Mobile applications, or "apps," offer "a range of tools for managing . . . . . all aspects of a person's life."  *Riley*, 573 U.S. at 396.  Mobile app stores offer millions of different apps for work, communication, health, entertainment - for nearly any imaginable task "there's an app for that." *Id.*

Robocalls are so pervasive that Americans now often ignore calls from unknown numbers. In one survey, Consumer Reports found that 70 percent of Americans do not answer calls from unrecognized numbers.  Consumer Reports, *What Have You Done in Response to Robocalls?* (Dec. 2018).[11]  Senator Schatz noted that "robocalls have turned us into a nation of call screeners" and emphasized that this is a "significant economic issue."  *Illegal Robocalls: Calling all to Stop the Scourge: Hearing before the S. Comm. on Com., Sci., and Transp.*, 116th Cong. (Apr. 11, 2019).[12]

---

[9]      Stephen J. Blumberg & Julian V. Luke, *Wireless Substitution: Early Release of Estimates From the National Health Interview Survey, July-December 2018* 1, National Center for Health Statistics (Jun. 2019) (https://www.cdc.gov/nchs/data/nhis/earlyrelease/wire-less201906.pdf).

[10]     Pew Research Center, *Mobile Fact Sheet* (June 12, 2019) (https://www.pewinternet.org/fact-sheet/mobile/)

[11]     https://www.consumerreports.org/robocalls/mad-about-robocalls/

[12]     https://www.commerce.senate.gov/public/index.cfm/hearings?ID=5A66BB4E-777B-4346-AA5F-CAB536C54862

One hospital reported persistent inability to reach patients because of call screening.  Tim Harper, *Why Robocalls Are Even Worse Than You Thought*, Consumer Reps. (May 15, 2019).[13]

Federal agencies receive a "staggering number of complaints about robocalls."  *Barr v. Am. Ass'n of Political Consultants, Inc.,* 140 S. Ct. 2335, 2343 (2020).  The FCC ranks automated calls as a "perennial top consumer complaint."  FCC, *Report on Robocalls* 2 (2019).[14]  State attorneys general also "field a constant barrage of complaints."  *Barr,* 140 S. Ct. at 2343.  Strong enforcement of the law is needed now more than ever.

The TCPA is intended primarily to deter and redress wrongs to the public generally.  *Hannabury v. Hilton Grand Vacations*, 174 F.Supp.3d 768, 775 (W.D. NY, 2016).  The TCPA's damages provision is specifically designed to be disproportional to the harm suffered because that both deters the violative conduct and "encourage[s] victims to bring suit to redress violations."  *Id.* at 776 (citing to *Universal Underwriters v. Lou Fusz Auto.*, 300 F.Supp.2d 888, 893 (E.D. Mo., 2004)).  Congress by the TCPA has sought to incentivize persons such as Plaintiff and her undersigned attorney to file court-complaints such as Doc. 5.  The UPA is of similar intent.  See for example *Jones v. General Motors*, 1998-NMCA-020 at ¶25 (encouraging private actions is also for benefit of "general citizenry").

**the Court should find that Defendants' 400 violations of the TCPA and 400 violations of the UPA were WILLFUL violations, thus authorizing up to treble damages**

Plaintiff's Complaint does not merely parrot conclusory allegations of willful, intentional

---

[13]     https://www.consumerreports.org/robocalls/why-robocalls-are-even-worse-than-you-thought/

[14]     https://docs.fcc.gov/public/attachments/DOC- 356196A1.pdf

and/or knowingly unlawful conduct by Defendants.   Plaintiff's Complaint states many facts that will support findings of willfulness by Defendants.   Both the TCPA and the UPA give the Court discretion to treble statutory damages if the Court finds willful violations.[15]

A pleading stating the phone number called is listed on the Registry, that single fact alone, is sufficient to support a finding of willfulness by the Defendants because they knew they were telemarketing, and they also knew they were not subscribing to or complying with the National Do-Not-Call Registry.   See for example *Lary v. Trinity Physician Fin.*, 780 F.3d 1101, 1106 (11th Cir. 2015).   See paragraphs 15 and 16 of Doc. 5 and incorporating the facts set forth in paragraphs 89-102 of "the Texas lawsuit"  (Doc. 1-2 filed herein on 2/16/22).   The Texas lawsuit describes in detail how Defendants continued their behavior even while they were being investigated by "The Traceback Group" (see paragraph 77 of Doc. 1-2).   The Texas lawsuit describes in detail how Defendants continued even after being repeatedly asked to comply with the Registry.   See paragraph 9 of  Doc. 1-1 on file in this case ("the FCC-Order).   Defendants knew about the Registry.[16]   Paragraph 18 of Doc. 5 states Smith and Shapiro have operated call-centers for many years  -  thus the Court can infer they are well-aware of the laws and regulations that apply.

A pleading stating that defendant used pre-recorded messages, also that single fact alone, is sufficient to support a finding of willfulness because the use of pre-recorded messages without

---

[15]    See Doc. 60 filed on 2/16/21 in *Mohon v. National Congress et* al, case no. 19-cv-652 in this District:   Judge Riggs' Opinion and Order reaching this same conclusion.   The Court should award $500 for each violation of the TCPA plus $100 more for each violation of the UPA.   If a violation of the TCPA was willful  the Court may award "*up to*" $1500 for the  violation.   Under the UPA the Court may award up to $300 for a willful violation.

[16]    See also paragraph 5 of Doc. 1-1 the FCC-Order about the enormity of Defendants' abusive robodialing and "malicious spoofing" (quoting from para. 9 of Doc. 1-1):   "23.6 million health insurance robocalls were crossing the networks of the four largest wireless carriers *each day*".   It is entirely believable that Barbara Mohon was subjected to "hundreds" of these calls.

consent of the person called is "prohibited technology", even where the phone number called is not listed on the Registry. *Glasser v. Hilton Grand Vacations*, 948 F.3d 1301, 1313 (11th Cir. 2020). Compare 47 U.S.C. § 227(b)(1)(A) with 47 U.S.C. § 227(b)(1)(B). It is unlawful to dial cell phone numbers using an "automatic telephone dialing system" (a/k/a "auto-dialer"), but it is NOT unlawful to auto-dial landline numbers that are not listed on the National Do-Not-Call Registry. It IS unlawful to use "an artificial or prerecorded voice to deliver a message" to ANY phone number (cell or landline) even if the phone number is not listed on the National Do-Not-Call Registry (unless of course the caller can show one of the few affirmative defenses such as prior express written consent). See *Glasser*, supra, 948 F.3d 1301 at 1305: the 11th Circuit **affirmed the trial court's finding** "that the Agency willfully violated the Act for thirteen of the calls that it made to Evans because those calls used an artificial or prerecorded voice[.]"

Paragraph 12 of Doc. 5 incorporates the facts stated in the FCC-Order. The facts described at paragraphs 14, 15 and 16 of the FCC-Order will support the Court's finding that all the Defendants herein violated UPA §57-12-**22(C)(2)** willfully.[17] Spiller and Mears ("Rising Eagle") stated that Smith and Shapiro ("Health Advisors") "prescribed" the intentional use of Caller-ID spoofing, and even provided the fake Caller-ID numbers to be used by Spiller and Mears (see footnote 67 of the FCC-Order; see also paragraph 33 of the FCC-Order). See also paragraphs 26 and 27 of Doc. 5 stating another type of harm to Plaintiff: Defendants also circumvented her phone's call-blocking feature by using numerous different spoofed Caller-Id numbers.

Paragraph 28 of the FCC-Order states "Rising Eagle" (Spiller and Mears) "by not including **required identification information** in its . . . . calls . . . . . intended to . . . make it more difficult

---

[17]     See paragraph 14 of Doc. 5 - "Rising Eagle" was one of these sham-entities used by Mears and Spiller. "Health Advisors" was the sham entity used by Smith and Shapiro.

to ascertain the identity of the caller". As further explained in the FCC-Order, including its paragraphs 25 and 26, this intent to harm consumers can be inferred by Defendants' criminal use of Caller-ID spoofing. These facts will support the Court's finding that all the Defendants herein violated UPA §57-12-**22(B)(1)** willfully. See also paragraphs 31, 32 and 33 of Doc. 5. To find out who was responsible for these calls, Plaintiff was forced to patiently listen to the sales pitch and buy the sham-product being marketed.

See also paragraph 19 of the FCC-Order with citations:

> "Rising Eagle [Spiller & Mears] unlawfully spoofed robocalls with the intent to defraud, cause harm, and wrongfully obtain something of value. Courts have recognized that direct evidence of specific intent is rarely available. Therefore, it is reasonable and often necessary to look at a party's actions to determine intent regarding a wrongful action."

Paragraphs 36-43 of Doc. 5 (Plaintiff's Amended Complaint) will support findings of willfulness by the Defendants. See also Plaintiff's Declaration at Exhibit 1 describing the affect Defendants' calls had on Plaintiff.

Plaintiff proffers additional evidence that will support findings by the Court that all statutory damages in this case should be trebled against all 4 Defendants: **Mears's deposition** in the Texas lawsuit is **Exhibit 2** hereto in support of this motion; portions of **Spears' deposition** in the Texas lawsuit is **Exhibit 3** hereto in support of this motion. These transcripts reflect that counsel for Shapiro and Smith participated in the depositions and had opportunity to cross-examine Mears and Spiller.

See **Exhibit 2 hereto** for some Mears' testimony about Shapiro's and Smith's state of mind and control over the telemarketing at issue:

1.    Mears and Spiller ("Rising Eagle") were compensated by Shapiro and Smith ("Health Advisors") on a "per sale" basis;   page 61 lines 2-4 of Mears' deposition testimony.    Thus all 4 Defendants were incentivized to make as many robocalls as possible.

2.    Shapiro and Smith exercised input over the robodialing on a daily basis;  pages 105-111. Shapiro and Smith would give Mears and Spiller "feedback" about consumer complaints resulting from the calls;  pages 124-125.

3.    Shapiro and Smith controlled the content of the pre-recorded messages used in the calls; pages 124-125.

4.    At pages 125-127 of his deposition Mears describes a method Defendants used to circumvent consumers' phones' call-blocking apps, and to circumvent carrier-networks' ability to mark for consumers certain call-traffic as "spam" or "scam call".

5.    Shapiro and Smith reviewed and approved the pre-recorded messages that were used; pages 128-130.

6.    Defendants did not bother to maintain any valid internal do-not-call list of consumers who had indicated objections to the calls;   pages 134-136.[18]

7.    "Health Advisors" (Shapiro and Smith) was "against" using "a federal DNC list" because a "large majority" of the "leads"  (i.e. - phone numbers) Defendants were calling were on that list, so if they complied with the Registry there would be "a lot of lost money" because they couldn't call nearly so many people;  pages 141-142.

---

[18]    See paragraphs 36-38 of  Plaintiff's Amended Complaint (Doc. 5).   Both the Telemarketing Sales Rule and the TCPA's implementing regulations require the maintenance of a valid internal do-not-call list, and that telemarketers be actively trained and supervised for compliance.   47 C.F.R. § 64.1200(d);   16 C.F.R. § 310.4(b)(1)(ii-iii);   16 C.F.R. § 310.4(b)(3)

8.      Shapiro sent lead files (lists of phone numbers to be uploaded into the dialer)  "daily, if not weekly";  pages 185-187 (quoting from lines 11-13, page 187).

9.      Shapiro and Smith were "not responsive" to requests to verify that consumers had consented to be called;  pages 190-191.

10.     At pages 200-209 Mears discusses in general Defendants' willingness to use fraudulent alleged opt-ins or consumer consents to be called, against any consumers who complained about the calls.   A website was created Defendants could tell **lies** to the FCC, the FTC and the Traceback Group about:  that consumers were visiting the website and filling out "online forms" requesting their calls.   See page 209 lines 3-9.

11.     At times Mears and Spiller acted under the "total control" of Shapiro and Health Advisors; pages 275-278

12.     Shapiro and Smith participated in a form of Caller-ID spoofing that the TCPA defines as a crime.  At pages 113-115 of his deposition Mears explains how Defendants would "manually test" their fake Caller-ID numbers by calling their own phones with those numbers to see whether the fake number had been flagged by the carrier-networks as a "scam likely" or "spam" call.    Mears was directed to engage in these activities by the other Defendants.  Mears depo page 127.

See **Exhibit 3 hereto** for a few things Spiller testified to under oath about Shapiro and Smith's culpability:

1.      At pages 37-40 of his deposition Spiller confirms Shapiro and Smith directly participated in the testing of their fake Caller-ID numbers in the manner described at pages 113-115 of Mears' deposition.

2.      At page 97 of his deposition Spiller confirms Shapiro and Smith were sending "millions" of phone numbers to call daily.   Spiller and Mears would "stockpile" lead lists.

11

3.      At page 99 Spiller disputes that during a particular 3-month period he made "1 billion" calls -   he says he only made approximately "400 million".

4.      Starting at line 22 on page 103 of his deposition Spiller explains how Shapiro and Smith objected to use of the word "robocall" to characterize what Defendants were doing, even though Defendants all knew they were using robocalls.  They decided to use the term "AI calls" as an acronym for "robocalls".   But the robocalls "absolutely" continued because "[Shapiro and Smith] wanted their room filled up with calls"  (page 106).

5.      At page 235  Spiller provides an explanation for why Defendants' pre-recorded messages, when left in consumers' phones' voicemail boxes, did not capture the entire message the consumer would have heard if the consumer had answered Defendants' call:  when Defendants' pre-recorded message was left on people's phones' voice-mail the first few seconds got cut off by the phones' voicemail greeting to the caller.


        Spiller has setup an overseas bank account he calls "Rising Eagle Cayman" to "protect himself from lawsuits".  Spiller depo, Exhibit 3 pages 131-136 of Spiller's testimony.   Mr. Spiller has not "filed" (i.e. - paid) taxes since 2016 and thinks he is just going to walk away from all consequences by filing for bankruptcy protection.    Exhibit 3 hereto page 287 of  Spiller's testimony.    Spiller is at least candid enough to admit it, but the other Defendants should be presumed to be doing the same thing:  hiding their bank accounts and pretending they have nothing for a creditor to collect.   It is important to Plaintiff that the Court make findings of willfulness against the Defendants.

### How  $570,000  is Calculated

Under Fed.R.Civ.P. 55(b)(1), judgment can be entered for a "sum certain" or a "sum that can be made certain by computation" where a defendant has been defaulted for a failure to appear. *KPS & Assocs., Inc. v. Designs By FMC, Inc.*, 318 F.3d 1, 20 (1st Cir. 2003).  To be a "sum certain" there must be no doubt as to the amount that must be awarded.  *Franchise Holding II, LLC. v. Huntington Rests. Group, Inc.,* 375 F.3d 922, 928–29 (9th Cir.2004).  A court may enter a default judgment without a hearing if the amount claimed is capable of mathematical calculation." *Hunt v. Inter–Globe Energy, Inc.,* 770 F.2d 145, 148 (10th Cir.1985).

Here, the amount claimed can be precisely mathematically calculated because set statutory damages can be awarded based on the number of violations.  Plaintiff's Declaration at Exhibit 1 hereto establishes there were at least 100 of the calls to Plaintiff described in Doc. 5, the FCC-Order (Doc. 1-1), the Texas lawsuit (Doc. 1-2) and Mr. Spiller's declarations in the record at Doc. 1-3 and Doc. 1-4 filed on 02/16/22.[19]   The Court has discretion to award additional statutory damages "up to" treble the other amounts if the Court is persuaded Defendants acted willfully, and depending on how egregrious the Court finds Defendants' willfulness to be.   The Court could award a nominal amount for willfullness or the Court could award Plaintiff in a judgment the maximum amounts authorized by the statutes for willfulness.

Defendants' behavior resulting in this case is particularly so egregrious it is doubtful an example of more flagrantly willful behavior would ever soon again be presented.   The Court should make findings of willfulness by Defendants and award Plaintiff the maximum amounts

---

[19]    See Judge Riggs' Opinion and Order  in *Mohon v. National Congress et* al, case no. 19-cv-652 in this District, Doc. 60 filed on 2/16/21, calculating statutory damages based on the number of violations at issue,  and citing to *Lary v. Trinity Physician Fin.*, 780 F.3d 1101, 1106 (11th Cir. 2015)

authorized by law.  Defendants are poster-boys for what an example set to deter other  would-be robo-dialers should look like.

## 100 violations of  47 U.S.C. § 227(b)'s prohibition on the use of prerecorded voice messages

Subsection **B** of the TCPA makes it illegal  "to make any call . . . . . using an automatic telephone dialing system **or** an artificial or prerecorded voice . . . . . to any telephone number assigned to a . . . . . cellular telephone service".  47 U.S.C. § 227(b)(1)(A).  Subsection B codifies a right of action to recover $500 for each violation of Subsection B **OR** the regulations prescribed under Subsection B.    Voicemail messages containing prerecords are subject to the same TCPA restrictions and remedies as traditional calls.   See *Schaevitz v. Braman Hyundai*, 437 F.Supp.3d 1237 (S.D. FL 2019) collecting citations, at 1247.

Paragraphs  23,  24,  25  and  29  of  Doc.  5  Plaintiff's  Amended  Complaint,  Plaintiff's supporting  Declaration  at  Exhibit  1  and  Spiller's  Declaration  at  **Doc.  1-3**  filed  in  this  case  on 02/16/22  establish there were "over" 100 calls to her cell phone made by Defendants using an artificial or prerecorded voice.  For 100 separate uses of an artificial or prerecorded voice directed to  Plaintiff's  cell-phone,   Plaintiff  is  presumptively  entitled  to  an  award  of  **$50,000**  for  one-hundred (100) Subsection B violations ($500 for each call), which should be trebled by the Court to $150,000.

## 100 violations of  47 U.S.C. § 227(b)'s prohibition on the use of
## automatic telephone dialing systems ("auto-dialers") for calls to cell-phones

Subsection B statutory damages are awarded per "violation", not just per "call".  See for example *Lary v. Trinity Physician Fin.*, 780 F.3d 1101, 1106 (11th Cir. 2015).

The  same  facts  also  establish  there  were  100  calls  to  Plaintiff's  cell  phone  made  by Defendants using an auto-dialer.  For 100 auto-dialer calls to a cell-phone by Defendants,  Plaintiff

is presumptively entitled to an additional award of **$50,000** for one-hundred (100) additional Subsection B violations ($500 for each call), which should be trebled by the Court to $150,000.

A plaintiff's descriptions of calls having characteristics of automated calls, is sufficient to prove an auto-dialer was used to make the calls. *Hickey v. Voxernet*, 887 F.Supp.2d 1125 (W.D. Wash. 2012); *Asher v. Quicken Loans, Inc.*, No. 2:17-cv-1203, 2019 WL 131854, at *3 (D. Utah Jan. 8, 2019) (calls "bore indicia of an automated dialer"); *Sessions v. Barclays Bank Del.*, 317 F. Supp. 3d 1208, 1213 (N.D. Ga. 2018) (when plaintiff answered she experienced "*dead air*" before a person would respond on the phone). "[A] TCPA plaintiff could describe . . . . . . the generic content of the message he received, or anything else about the circumstances of a call or message contributing to his belief it was prerecorded or delivered via an ATDS." *Sojka v. DirectBuy, Inc.*, 35 F. Supp. 3d 996, 1002 (N.D. Ill. 2014). Judge Vazquez has relied on the same or similar authorities. *Mestas*, supra, 508 F.Supp.3d 1011 at 1026.

Based on these authorities, these 2 undisputed facts taken together, or alone, are sufficient to prove by a preponderance of the evidence that the 100 calls were made with an auto-dialer:

1.    the use of pre-recorded messages;   use of pre-recorded messages indicates that the calls are made on an automated basis;  actual homo sapiens taking the time to manually make phone calls do not greet the callee with a pre-recorded message.

2.    the harassingly repetitive nature of the calls described by Plaintiff, and their generic standardized sales pitch not directed to any specific named person in particular but to any person who might be reached at the phone number called.   At paragraph 25 of Doc. 5 Plaintiff says "It was always the same identical message in all the calls".

But here the Court need not rely solely on the foregoing 2 sets of facts.   Additional evidence to support a finding an auto-dialer was used is:

3.    Mr. Spiller himself at page 1 of  Doc. 1-3 filed in this case on 02/16/22  admits outbound calls were made "automatically".

4.    See also the facts set forth at paragraphs 26 and 27 of Plaintiff's Amended Complaint.   As was referred to above, the FCC has found that Caller-ID manipulation is, among other things, evidence of "malicious" intent to evade the consequences of other unlawful conduct.   In other words, Caller-ID spoofing is not done for the sake of Caller-ID spoofing alone.  It is done in conjunction with other knowingly unlawful conduct such as:  auto-dialing.  See again for example paragraphs 4, 8, 9, 15, 19, 24 and 25 of  Doc. 1-1 filed in this case on 2/16/22.

5.    The volume of calling by Defendants supports a finding they used an auto-dialer to make the calls.   See again paragraphs 5, 8 and 9 of the FCC-Order about "millions of robocalls daily".  See again page 99 of Spiller's deposition testimony where he himself acknowledges "400 million" calls during a particular 3-month period.

**<u>Statutory damages provided for by the New Mexico Unfair Practices Act</u>**

"[T]wo statutes covering the same subject matter should be harmonized and construed together when possible, in a way that facilitates their operation and the achievement of their goals." *State ex rel. Schwartz v. Sanchez*, 1997-NMSC-021, ¶ 7, 936 P.2d 334, 335.   The legislative histories of the TCPA and the UPA confirm that the TCPA and the UPA are intended to be applied together, neither to the exclusion of the other.

"Congress determined that federal legislation was needed because telemarketers, by operating interstate, were escaping state-law prohibitions on intrusive nuisance calls." *Mims v. Arrow Financial*, 132 S.Ct. 740, 744, 181 L.Ed. 881, 565 US 368, 371 (2012).  Prior to the TCPA, the Communications Act (of which the TCPA is a part) preempted all local state-law claims for unlawful telemarketing.   So Congress passed the TCPA to remove this pre-emption bar, to allow

consumers to sue in their local courts, and to allow consumers to recover certain additional damages provided for by the TCPA in addition to the remedies provided by the various state consumer-protection laws.   See also *Mims*, 565 US 368 at 372-373.   See also for example the TCPA itself at 47 U.S.C. § 227(f):   if the New Mexico Legislature wanted to, it could completely ban any and all telemarketing directed into the State of New Mexico no matter what.

The TCPA and complimentary state privacy laws are routinely construed and applied together by courts across the country.  See as but one example *Charvat v. NMP, LLC*, 656 F.3d 440 (6th Cir. 2011).  In this case the Sixth Circuit considered the extent to which Phil Charvat could recover statutory damages pursuant to the TCPA along with statutory damages provided for by a Ohio state statute, for the same calls.   In deciding which of the same conduct by the telemarketer Phil could recover damages for under both statutes, the Court focused on the particular harm, violation or cause of injury to be addressed by the state statute, such as at  656 F.3d 451:

> ". . . . Charvat also alleges that, during the telephone calls, Defendants failed to provide their name and telephone number or address, failed to maintain a record of his previous request to be placed on a do-not-call list, and failed to honor his previous do-not-call request. As the cases cited by Charvat in his complaint indicate, R.20 (2d Am. Compl. ¶ 57 n.2), Ohio courts have found that these violations of the TCPA are unfair or deceptive practices under the OCSPA."

The Court continued as such:

> "The two injuries, however, are separate and distinct, and Charvat therefore is entitled to separate damage awards for both injuries. Additionally, the disclosure provisions in O.A.C. § 109:4–3–11(A)(1) and 16 C.F.R. § 310.4(d)(2) are directed at a third distinct harm—deceiving the caller about the purpose of the call. Thus, Charvat is entitled to a separate damage award under the OCSPA for Count Eleven."

17

*Charvat v. NMP*, supra, 656 F.3d 440 at 452.   Legislatures have "the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before".  *Mey v. Venture Data LLC*, 245 F.Supp.3d 771, 776 (N.D. WV 2017) (citing *Spokeo Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016)).

**Exhibit 4** hereto in support of this motion is a copy of the New Mexico Legislature's 2003 session law that enacted the current version of NMSA § 57-12-22.   Note Section 11 of the enactment in particular:   "Sections 1 through 7 of this act are repealed on the date that a federal do-not-call rule adopted by the federal communications commission is effective".  The legislature repealed the "Consumer No-Call Act", the Sections 1 through 7 referred to, when New Mexicans finally had remedies pursuant to Subsection C of the TCPA.  But the Legislature specifically left the balance of Section 22 of the UPA in place, as-is.   The Court can also discern the New Mexico legislature's intent by comparing the version of Section 22 of the UPA that was in effect in 2002 (copy at **Exhibit 5 hereto**) with the current version enacted by Exhibit 4 in 2003.    There can be little doubt the New Mexico Legislature intended the Unfair Practices Act to be applied together with the TCPA, to provide for additional statutory damages for certain acts declared to be violations of the UPA.

Statutory damages provided for by the UPA are,  like the damages provided for by the TCPA,  stacked "per violation".    NMSA §57-12-10(B):    "[Plaintiff] may bring an action to recover actual damages or the sum of one hundred dollars ($100)"  for ***any act*** declared unlawful.

## 100 violations of NMSA § 57-12-22(A)

The statute says  "A person shall not utilize an automated telephone dialing . . . . . . system with a prerecorded message to solicit persons to purchase goods or services".   Here, the New

Mexico Legislature has provided that a New Mexican may recover an additional $100[20] (or $300 for a willful violation) under state-law for the same conduct for which the consumer can also recover statutory damages under Subsection B the TCPA.

Based on the same evidence and arguments as are set forth above regarding Defendants' violations of Subchapter B of the TCPA, the Court should find Defendants willfully violated Section 22(A) of the UPA  -  the calls were "automated" and included a prerecorded message.

For 100 separate violations of 22(A), Plaintiff is presumptively entitled to an additional award of **$10,000** (100 x $100), which should be trebled by the Court to $30,000.

### 100 violations of NMSA § 57-12-22(B)(1)

The statute says  "It is unlawful under the Unfair Practices Act for a person to make a telephone solicitation . . . . . without disclosing within fifteen seconds of the time the person being called answers the name of the sponsor and the primary purpose of the contact."

Here the New Mexico Legislature has provided that a New Mexican may recover $100 (or $300 for a willful violation) under state-law for conduct for which the consumer can <u>NOT</u> also recover statutory damages under the TCPA.   Note again the New Mexico legislature clearly was mindful of what the TCPA provided for when it passed this statute (and left it in place when the Consumer No-Call Act was repealed).

Based on the same evidence and arguments as are set forth above including but not limited to paragraph 31 of Doc. 5, the Court can find Defendants willfully violated 22(B).  For 100 separate violations of 22(B)(1), Plaintiff is presumptively entitled to an additional award of  **$10,000** (100 x $100), which should be trebled by the Court to $30,000.

---

[20]      plus attorney fees and costs

**100 violations of NMSA § 57-12-22(C)(1)**

The statute says "It is unlawful for a person to make a telephone solicitation of a residential subscriber whose telephone number has been on the national do-not-call registry, established by the federal trade commission, for at least three months prior to the date the call is made."

As is set forth above, Plaintiff's phone number was listed on the Registry at all relevant times but Defendants still robodialed her over 100 times. For 100 separate violations of 22(C)(1), Plaintiff is presumptively entitled to an additional award of **$10,000** (100 x $100), which should be trebled by the Court for willfulness to $30,000.

**100 violations of NMSA § 57-12-22(C)(2)**

The statute says "It is unlawful for a person to use a method to block or otherwise intentionally circumvent a residential subscriber's use of a caller identification service." Here again the New Mexico Legislature has provided that a New Mexican may recover $100 (or $300 for a willful violation) under state-law for conduct for which the consumer can <u>NOT</u> also recover statutory damages under the TCPA.

A "caller identification service" is "any service or device designed to provide the user of the service or device with the telephone number of, or other information regarding the origination of, a call[.]" 47 U.S.C. § 227(e)(8). Thus even the facts stated at paragraph 26 of Plaintiff's Complaint (Doc. 5) give Fed.R.Civ.Pro. 8 notice of claims for violating 22(C)(2) because Plaintiff's phone's call-blocking feature was designed to provide information regarding the origin of the calls. At pages 125-127 of his deposition at Exhibit 2 hereto Mears even describes a method Defendants intentionally used to circumvent Caller-ID services. For 100 separate violations of

20

22(C)(2), Plaintiff is presumptively entitled to an additional award of **$10,000** (100 x $100), which should be trebled by the Court for willfulness to $30,000.[21]

### Statutory damages provided for by Subsection C of the TCPA

In contrast to Subsection B's express prohibitions on the use of auto-dialers and pre-recorded messages, Subsection C of the TCPA merely mandates that the Federal Communications Commission ("FCC") "shall" conduct rulemaking proceedings and "prescribe regulations to implement methods and procedures for protecting [subscriber] privacy rights".   47 U.S.C. §227(c)(5) codifies a separate private right of action in plain language:

> **"A person who has received more than one telephone call within any 12-month period . . . . . in violation of the regulations . . . . may . . . . bring . . . . (B) an action to . . . . . receive up to $500 in damages for each such violation[.]**

Even though as set forth below the law would otherwise permit the Court to award Plaintiff $300,000 for 200 willful violations of Subsection C of the TCPA within 100 unlawful calls, paragraph 57 of Doc. 5 limits Plaintiff's Subsection C claim to a maximum of $150,000 (the Amended Complaint states the Court should award $1500 per call).   A Default Judgment cannot award a plaintiff more than the plaintiff's pleadings sought.

As set forth above the Court can award Plaintiff  $300,000 for Defendants' TCPA-Subsection B violations, and an additional $120,000 pursuant to the UPA.   $150,000 added to these figures for willful  TCPA-Subsection C violations equals:   **$570,000 total**.

---

[21]   The language "pursuant to the Consumer No-Call Act" that continues to appear in 57-12-22(C)(2) appears to be at this point superfluous.   As previously set forth, the New Mexico legislature specifically left an enhanced version of Section 22 in place when it repealed the Consumer No-Call Act (see again Exhibit 4 in support of this motion).   The legislature underlined added subsection C to Section 22 of the UPA, as part of the session law at Exhibit 4.   Compare the current version of Section 22 with the version that existed in 2002 (Exhibit 5 in support of this motion).

47 C.F.R. § 64.1200**(c)**

As discussed above and also in detail in *Mestas v. CHW Group Inc. et al*, 508 F.Supp.3d 1011 (D.NM 2020) this regulation adopted pursuant to Subsection C makes it a violation to call a residential phone number that is listed on the National Do-Not-Call Registry.   Since the violation is the call itself, there can obviously be only 1 violation of this regulation "per call".

As is set forth above, Plaintiff's cell phone number was listed on the Registry at all relevant times but Defendants still robodialed her over 100 times.   For 100 violations of 47 C.F.R. § 64.1200**(c)** Plaintiff is presumptively entitled to an additional award of **$50,000** ($500 for each call), which could be trebled by the Court  up to $150,000 if the Court finds the violations were willful.

47 C.F.R. § 64.1200**(d)**

This separate regulation was also adopted pursuant to Subsection C of the TCPA.  *Mestas*, supra, 508 F.Supp.3d 1011 at 1029;   *Charvat v. NMP*, 656 F. 3d 440 (6th Cir. 2011);  *Rosenberg v. LoanDepot*, 435 F.Supp. 3d 308, 324-325 (D.Mass.2020).   §64.1200**(d)** makes violative harms that are distinct and different from the harms made actionable by § 64.1200**(c)**.  Pursuant to §64.1200**(d)** telemarketers must adopt and implement a number of internal business policies and practices, including "maintenance of do-not-call lists", training etc.  It is a violation of the regulation (and hence Subchapter C) to make ANY telemarketing calls without having first complied with this regulation, *even if none of the calls are directed to phone numbers listed on the National Do Not Call Registry*.[22]

---

[22]    The regulation plainly says  "No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:  . . . . . . .

Paragraphs 28 and 30 of Doc. 5 establish that Defendants called Plaintiff 100 times in violation of §64.1200**(d)** too.  At pages 134-136 of his deposition at Exhibit 2 hereto Mears himself even confirms Defendants did not bother to maintain any valid internal do-not-call list of consumers who had indicated objections to the calls.  For 100 violations of 47 C.F.R. § 64.1200**(d)** Plaintiff is presumptively entitled to an additional award of **$50,000** ($500 for each call), which could be trebled by the Court  up to $150,000 for willfulness.

No published federal court-opinion has directly adequately addressed the issue of whether a plaintiff may recover $500 for a violation of 47 C.F.R. § 64.1200**(d)**, and $500 more for a violation of 47 C.F.R. § 64.1200**(c)**, where both violations occur as a result of the same call.  One Court in the Third Circuit thought it did so in its footnote 10,  *Shelton v. Fast Advance Funding*, 378 F.Supp.3d 356 (E.D. PA, 2019), by citing to cases in the Sixth Circuit.    But *Shelton* did not carefully enough consider what the Sixth Circuit actually determined in *Charvat v. GVN Michigan*, 561 F.3d 623 (6th Cir. 2009).  The issue is not directly addressed either in *Lary v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101 (11th Cir. 2015).   The District of New Mexico and the Tenth Circuit should get it right.[23]

Neither *GVN Michigan* nor its sequel *Charvat v. NMP LLC*, 656 F.3d 440 (6th Cir.2011) held that a consumer could not recover the statutory damages for a violation §64.1200**(d)**, and

---

[23]      In *Cordoba v. DirecTV*,  942 F.3d 1259 (11th Cir. 2019) the Eleventh Circuit also got it wrong on a tweak about 47 C.F.R. § 64.1200(d) where, at 1272,  it stated "*if an individual not on the National Do Not Call Registry was called by Telecel and never asked Telecel not to call them again, it doesn't make any difference that Telecel hadn't maintained an internal do-not-call list. Telecel could and would have continued to call them even if it had meticulously followed the TCPA and the FCC regulations*".   A claim pursuant to §64.1200(d) does not require the plaintiff's phone number be listed on the National DNC Registry.  The plain language of the regulation makes it a violation to call ANY residential telephone subscriber prior to maintaining in good faith an internal business policy and practice to honor specific "do-not-call again" requests.   See also for example *Laccinole v. Appriss*, 453 F.Supp.3d 499, 505 (D.RI 2020) stating the elements of a claim made pursuant to §64.1200(d).

$500 more for a violation of 47 C.F.R. § 64.1200**(c)**, where both violations arise from the same call. *Shelton* misapprehended that *GVN Michigan* explained simply that there can only be one violation of §64.1200(d) per call.

It is a sensible conclusion that there can only be one violation of §64.1200(d) "per call" because the violation is in fact "to make a call" prior to having maintained the practices required by §64.1200(d). Same for §64.1200(c) where the violation is also "to make a call". If the violation is "to make a call", logically there can only be one violation "per call". But §64.1200(d) and §64.1200(c) each remediate different types of harms, so there can in fact be multiple violations of the TCPA's Subsection C "per call": a violation of §64.1200(c) and a violation of §64.1200(d).

As *GVN Michigan* correctly notes, the language at 47 USC § 227(c)(5) merely imposes a threshold requirement of multiple calls within a year, for a consumer to have standing for Subsection C claims. See *GVN Michigan*, supra, 561 F.3d 623 at 630-631. For whatever reason, Congress made a policy decision that unlike Subsection B of the TCPA "1-call cases" are not permitted under Subsection C. To extrapolate this language in the statute pertaining to threshold standing requirements, because the language necessarily uses the word "call" to express the threshold requirement (unlike the language used at 47 USC § 227(b)(3)), into a blanket interpretation that there can only be one violation of Subchapter C per call, is incorrect. The statute's use of the word "call" is simply in reference to the requirement of "more than one" call within a year. The plain language of 47 USC § 227(c)(5) is that, just like under Subsection B, a plaintiff may receive $500 for each violation of the regulations, even if both possible violations occur as a result of the same call.

As the Sixth Circuit noted itself in *NMP LLC*, 656 F.3d 440, it painted with too broad a brush where it used sweeping language like that at 561 F.3d 631 of *GVN Michigan* ("the TCPA

24

does not allow for the award of statutory damages for each violation during a call, but instead limits statutory damages to one award per call").  *GVN Michigan* should have been more precise with the language it used because it was discussing only whether there could be multiple violations of 47 C.F.R. § 64.1200(d) per call.  Even though in *NMP LLC* the court dialed-back its overbroad language to correct itself as to Subsection B of the TCPA, *NMP LLC* continued to fail to note that the discussion in *GVN Michigan* was only whether there could be multiple violations of §64.1200(d) within each call.

The word "call" is used in 47 U.S.C. §227(c)(5) merely to express a threshold standing requirement, not to limit the damages a plaintiff may recover.  The statute plainly says a plaintiff may recover for "each" violation.


WHEREFORE, Plaintiff requests entry of judgment against Defendants jointly and severally for the statutory damages resulting from 200 violations of TCPA-Subsection B, 200 violations of TCPA-Subsection C  and 400 violations of the UPA.   The Court should find that Defendants' violations were willful and award Plaintiff additional statutory damages up to a maximum amount of  $570,000 total.   Plaintiff prays the Court's judgment will include applicable post-judgment interest and such other and further relief as the Court finds proper.

RESPECTFULLY  SUBMITTED,

By:    /s/  Sid  Childress

_____
Sid Childress, Lawyer
1925  Aspen  Dr.  #600A
Santa  Fe,  NM  87505
(505) 433 - 9823
Attorney for Plaintiff


## **CERTIFICATE OF SERVICE**

I caused this document and all Exhibits to be served in accordance with D.N.M.LR-CIV.

5.1 by filing it through the Court's CM/ECF electronic filing system.

On receipt of a conformed copy of this document from the Clerk of Court I will also regular

USPS mail a conformed copy to:

Scott Perry Shapiro,  2352 Date Palm Rd.,  Boca Raton, FL  33432;

Michael Theron Smith Jr.,  10343 S. Barnsley Dr.,  Parkland, FL  33076;

John Caldwell Spiller II,  9022 N. Ferndale Dr.,  Houston, TX  77064;

Jakob Alexander Mears,  9009 N. FM 620 #2208,  Austin, TX  78726


/s/  Sid  Childress

_____

26